HERBERT D. PHILBRICK *vs.* ATLANTIC SHORE LINE RAILWAY.

CHARLES LEWIS CASS *vs.* ATLANTIC SHORE LINE RAILWAY.

York.    Opinion December 29, 1910.

*Street Railways.    Crossing Accidents.    Negligence.    Contributory Negligence.*
*Proximate Cause.*

A traveler approaching an electric railroad crossing is bound to exercise a
degree of caution commensurate with the situation, and where plaintiff
was driving a team and wagon along a road parallel with a car line,
knowing that a car going in the same direction was due, and heard it when
it was 300 or 400 feet away, and saw it when it was less than 100 feet away
approaching at a speed of 10 or 12 miles an hour, and he turned his horses
and deliberately drove upon the track to enter a private way on the other
side, resulting in a collision, he was negligent.

The driver, not only having negligently put himself in a place of peril, but
having continued negligently to move on to the catastrophe until it
happened, his negligence was the proximate cause of the injury, and any
negligence of the motorman in charge of the electric car was not independ-
ent of the driver's contributory negligence, but contemporaneous with it,
and the doctrine of discovered peril does not apply.

An electric railroad crossing is a place of known danger, and no one should
approach it without senses alert, nor should one attempt to pass over it
without considering the safety or peril of the act.    Travelers upon the
highway should know that upon them as well as upon the motorman rests
a duty of anticipating and avoiding collisions, a duty which they owe not
only to themselves, but to the railroad company and to the passengers in
the car.

On motions for new trials by defendant.    Sustained.

Two actions on the case brought to recover damages caused by a
collision between a team owned by the plaintiff Philbrick and
driven by the plaintiff Cass, and a car of the defendant, as Cass
was attempting to drive across the tracks of the defendant in the
town of York to reach a private way leading to Dover Bluff.    Plea,
the general issue in each case.    The two actions were tried together.
Verdict for the plaintiff Philbrick for $160.75, and for the plaintiff
Cass for $236.66.    The defendant filed a general motion to have
each verdict set aside.

The case is stated in the opinion.

*E. P. Spinney*, for plaintiffs.

*Fred J. Allen*, *Cleaves*, *Waterhouse & Emery*, *and John C. Stewart*, for defendant.

SITTING : EMERY, C. J., SAVAGE, PEABODY, SPEAR, CORNISH, KING, JJ.

CORNISH, J. About 11.40 in the forenoon of September 11, 1908, the plaintiff Cass, an employe of the plaintiff Philbrick, was driving the team of said Philbrick along the highway in the town of York and in attempting to cross the tracks of the defendant at the entrance of a private way leading to Dover Bluff, was hit by a car of the defendant, resulting in injuries to both driver and team. These actions of tort were brought to recover damages caused by this collision and are before this court upon defendant's motion to set aside a verdict for the plaintiff in each case as against the evidence.

The situation may be stated briefly. The general direction of the highway was easterly and westerly, the electric railroad track running along the southerly side and the private way leading off at right angles toward the south. The plaintiff's team consisted of a single horse and a canvas covered fish cart, like a butcher's cart, with a tight compartment partition back of the driver's seat. The top of the cart projected over the seat, with curtains at either end which were rolled up on the day of the accident. The horse was gentle, slow and not afraid of electric cars. The driver Cass, was a man of mature years and familiar with this locality, as it was a part of the route over which he regularly travelled in his business of peddling fish. Cass was moving westerly along the highway, parallel with the railroad track, at a rate of five or six miles an hour until he came to the LaBonte house about 71 feet from the crossing. The electric car was moving in the same direction at a rate, as the defendant claims of six or eight miles or as the plaintiff claims of ten or twelve miles an hour. Beginning at a point about 400 feet easterly from the crossing there was a down grade of about

2 % to the crossing and for that entire distance a person approaching the crossing had a clear view of the track. It was a straight course and no trees or buildings obstructed the vision. The plaintiff claims that as he was driving along the northerly side of the highway opposite the LaBonte house, which was 71 feet from the crossing, he met a team, which passed him on the wrong side, forced him nearer to the tracks, and brought his horse down to a walk; that at that time and at that spot he first became aware of the approaching car as he then heard the buzzing of the electric wire; that about that time he changed his own position from the northerly to the southerly end of the seat so that he could and did see the car; that after passing the team he veered the horse back somewhat towards the northerly side of the road, and continued on his way; that as he was swinging around to the left to approach the crossing, and when the horse was at a little distance from the first rail, he observed the car a second time, at a distance estimated by him to be between seventy and one hundred feet, and approaching at an estimated speed of ten or twelve miles an hour; that nevertheless he drove upon the track, but, as he says, "when I got on the track I didn't think I could get out of the way quick enough to avoid an accident because they hadn't slowed up any;" that the team had nearly passed over when the car collided with the cart and both the team and the driver were injured.

This simple rehearsal shows the driver's conduct to have been careless even to the verge of recklessness. He knew that the car, which was on time, was due, and he says that he was expecting it. He heard it when it was probably three hundred or four hundred feet away. He saw it distant less than one hundred feet and approaching as he thought at a speed of ten or twelve miles an hour just before he reached the rails. If the speed were ten miles an hour the intervening distance would be covered in seven seconds. And yet knowing the car was in such close proximity he deliberately drove upon the track. Had he stopped where he was, as he could have done and as ordinary prudence would dictate that he should have done, all would have been well. He may have thought that he could cross before the car would reach him. If so, he took his

chances and lost and upon him alone should fall the blame.    It
was at the most a matter of a few seconds and safety ought not to
hang on so narrow a margin.

The defendant contends that the accident did not happen exactly
as the plaintiff would have us believe, and introduced evidence to
the effect that the plaintiff was driving along parallel with and
quite near to the tracks when he suddenly turned his horse upon
the crossing and, before he could get clear, was struck.    This is the
testimony of the motorman and he is corroborated by a passenger
in the car and by one Bowden, the plaintiff's own witness, who saw
the accident from his premises across the way, at a distance of only
137 feet.    Bowden says that when he came out of his barn the
horse's head was about the length of the team from the crossing
and the plaintiff was still driving parallel with the tracks, that he
then began gradually to swing towards the crossing and at that
time the car was at the LaBonte house a distance of only 71 feet,
so near that he himself thought there must be an accident and he
waited for the result.    Whether therefore we take the situation as
Cass describes it, or as the witness in the car and the spectator on
the road saw it, the accident is plainly due to the want of ordinary
care on the part of Cass himself.    It was incumbent upon him to
exercise the care of an ordinarily prudent man in view of all the
existing conditions.    Seeing the approaching car he should have
had some regard for its apparent speed and for his own.    If, as he
claims, the car was then coming at a rapid rate, that fact was
patent to him and should have deterred him the more from crossing.
While it is true that it is not negligence per se to drive across an
electric railroad track without looking or listening, or even in front
of an approaching car although one has misjudged the distance and
speed, yet such traveller is bound to exercise a degree of vigilance
and caution commensurate with the situation.    An electric railroad
crossing is a place of known danger and no one should approach it
without senses alert, nor should one attempt to pass over it without
considering the safety or peril of the act.    Travellers upon the
highway should know that upon them as well as upon the motormen
rests a duty of anticipating and avoiding collisions, a duty which

they owe not only to themselves but to the railroad company and to the passengers in the car. The failure to meet that duty was the cause of the accident under consideration.

The plaintiff relies upon *Marden* v. *Street Railway*, 100 Maine, 41, as justifying his course, but the principles laid down in that case which involved the crossing of a track without looking or listening are not in conflict with this opinion. They are in harmony with it and a verdict for the plaintiff was sustained in that case, not because of the application of other legal rules but because of the facts there existing which were quite unlike the facts of this case. Here the plaintiff's conduct falls little short of gross negligence and brings the case within recent decisions of this court under strikingly similar conditions. *Fairbanks* v. *Railway Co.*, 95 Maine, 78; *Butler* v. *Railway*, 99 Maine, 149; *Denis* v. *Railway Co.*, 104 Maine, 39.

As an excuse for attempting to cross within the very reach of the approaching car, the plaintiff introduced the sudden passing of an automobile as he was about to cross, the alleged effect of which was, first to cause the horse to jump back, and then to start ahead. The evidence is convincing that no such occurrence took place. Plaintiff's witness Bowden was watching the scene a short distance away and says that he saw no automobile whatever. Had there been one he must have seen it. The motorman states the same. But even had an automobile appeared, as the plaintiff claims, it afforded no excuse or reason for his conduct. The road was very wide at that point, in fact was almost an open square and there was ample room for both. It is apparent from the plaintiff's whole evidence that he drove upon the track not involuntarily but voluntarily. On the point of the plaintiff's due care therefore the verdict was clearly wrong.

It is unnecessary to consider the question of the defendant's negligence except to inquire whether, notwithstanding the plaintiff's want of due care in driving upon the track, the motorman then by the exercise of ordinary care and skill might have avoided the injury, that is, whether what is known as the "last chance" doctrine had application, as laid down in a line of cases like *Atwood* v.

*Railway Co.*, 91 Maine, 399 ; *Conley* v. *Railroad Co.*, 95 Maine, 149 ; *Ward* v. *Railroad Co.*, 96 Maine, 146.  A careful study of the testimony shows that this principle cannot be invoked. The evidence is strong and convincing that the motorman exercised vigilance and skill commensurate with the demands of the situation. The car was not moving at an excessive rate of speed as is shown by the fact that it was stopped in going a length and a half and that too, without any sudden shock to the passengers.   The motorman was in perfect control.   It is evident that the turn towards and upon the crossing was made by the plaintiff so suddenly that the motorman did not have time to avoid the collision.   The language of this court in *Butler* v. *Railway*, 99 Maine, 149-159, meets this situation with peculiar force.   "But even if the brakeman, seeing the situation, failed seasonably to take the necessary steps to prevent a collision which was apparently not only likely to happen but all the more likely to happen and which probably would happen, because of the apparent negligence or ignorance of the plaintiff, was his failure the approximate cause of the plaintiff's injury ?   Was his negligence in that respect subsequent to and independent of the plaintiff's contributory negligence?   We are constrained to say that it was not.   It was contemporaneous, not subsequent.   It operated to produce the result in connection with the plaintiff's negligence and not independently of it.   The plaintiff's negligence actively continued from the corner of the house to the point of collision.  It was operative to the last moment and contributed to the injury as a proximate cause.   It is not like the case of one who by his own prior negligence has merely put himself in a position of danger, as in *Atwood* v. *Railway Co.*, 91 Maine, 399, and *Ward* v. *Railway Co.*, 96 Maine, 145, in which cases the distinction is well illustrated.   The plaintiff not only negligently put himself in a place of peril, but continued negligently to move on to the catastrophe until it happened.   The language of the doctrine of prior and subsequent negligence implies that the principle is not applicable when the negligence of the plaintiff and that of the defendant are practically simultaneous.

It is the opinion of the court therefore that the plaintiff's want of due care was the proximate cause of the accident and that the verdict is so unmistakably wrong that it should not be allowed to stand.

*Motion sustained in each case.*
*Verdicts set aside.*